[Cite as *State v. Drane*, 2021-Ohio-730.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28757 |
| | : | |
| v. | : | Trial Court Case No. 2018-CR-4239/2 |
| | : | |
| JAMARIYO DRANE | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 12th day of March, 2021.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by LISA M. LIGHT, Atty. Reg. No. 0097348, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

BRADLEY S. BALDWIN, Atty. Reg. No. 0070186, 854 East Franklin Street, Centerville, Ohio 45459
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Defendant-appellant, Jamariyo Drane, appeals from his conviction in the Montgomery County Court of Common Pleas after he was found guilty of grand theft of a motor vehicle, felonious assault, burglary, having weapons under disability, and multiple firearm specifications. In support of his appeal, Drane contends that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence. For the reasons outlined below, we find that the evidence was sufficient to support Drane's convictions and that his convictions were not against the manifest weight of the evidence. Therefore, the judgment of the trial court will be affirmed.

**Facts and Course of Proceedings**

{¶ 2} On November 20, 2018, a Montgomery County grand jury returned a five-count indictment charging Drane with robbery in violation of R.C. 2911.02(A)(3), felonious assault (serious physical harm) in violation of R.C. 2903.11(A)(1), felonious assault (deadly weapon) in violation of R.C. 2903.11(A)(2), burglary in violation of R.C. 2911.12(A)(2), and having weapons under disability in violation of R.C. 2923.13(A)(2). The two counts of felonious assault and the single count of having weapons under disability each included a three-year firearm specification under R.C. 2941.145(A) and a 54-month firearm specification under R.C. 2941.145(D).

{¶ 3} Drane pled not guilty to the indicted charges and the matter proceeded to trial. Drane elected to waive his right to a jury trial on the charge for having weapons under disability and on its attendant three-year and 54-month firearm specifications. Drane also waived his right to a jury trial on the 54-month firearm specifications attached to the two counts of felonious assault. Therefore, the aforementioned specifications and

the count for having weapons under disability were tried to the bench, while the remaining counts and specifications were tried to a jury.

{¶ 4} At trial, the State presented witness testimony and exhibits that pertained to a string of events that occurred during the early morning hours of November 26, 2017, in Harrison Township and in Dayton, Montgomery County, Ohio. In doing so, the following information was elicited at trial.

*Theft of Vehicle at Club Plush*

{¶ 5} Around midnight on November 26, 2017, Drane went to Club Plush in Harrison Township with Marquisa Goode, Jermichael Taylor, and Davon Williams. Goode drove the group to the club in her two-door, silver Chevy Monte Carlo. After a fight broke out at the club, Drane, Taylor, and Williams left the club in Goode's vehicle without Goode.

{¶ 6} At approximately 2:00 a.m., Goode called 9-1-1 to report that her vehicle had been stolen. The responding officer, Montgomery County Sheriff's Deputy Joseph Schwieterman, testified that Goode flagged him down at Club Plush and told him that she saw three males getting into her vehicle after a fight broke out at the club. Goode also told Dep. Schwieterman that she knew one of the males, who she identified as "Davon," and that the male who was in the driver's seat pushed her to the ground when she attempted to get him out of her vehicle.

{¶ 7} Detective Bryan Statzer of the Montgomery County Sheriff's Department met with Goode the following day. Det. Statzer testified that Goode was able to locate a photograph on social media that depicted the driver who took her vehicle. Det. Statzer

testified that after passing the photograph on to other detectives, he learned that the driver's name was Jamariyo Drane.

{¶ 8} One of the passengers, Williams, testified at trial and confirmed that Drane was the driver of Goode's vehicle when he, Drane, and Taylor left Club Plush. Williams also testified that he rode in the back seat and Taylor rode in the front-passenger seat. Williams further testified that he was intoxicated and passed out as Drane was driving. Williams did not recall how Drane obtained Goode's car keys and did not recall seeing Drane push Goode.

*Shooting at Siebenthaler and Salem Avenues*

{¶ 9} Around 2:00 a.m. on November 26, 2017, Shavorea Williams, who is not related to Davon Williams, was driving a friend home from the Elks Lodge in Dayton, Ohio. Shavorea's friend lived in Dayton just off of Siebenthaler Avenue. After dropping off her friend, Shavorea saw a vehicle driving behind her while she was near the intersection of Siebenthaler and Salem Avenues. Shavorea thought that the vehicle was going to pass her because she was driving too slow; however, when the vehicle pulled around her on the driver's side, she saw flashes and realized that someone in the vehicle was shooting a firearm at her. Shavorea testified that the vehicle was a black Monte Carlo and that she saw the shooter's hand sticking out the passenger-side window. Shavorea also testified that she saw two black individuals inside the vehicle.

{¶ 10} After the shots were fired, Shavorea sped away from the vehicle. However, when she looked in her rearview mirror, Shavorea saw that the vehicle was still behind her. In an attempt to lose the vehicle, Shavorea decided to make a quick left-

hand turn off of Siebenthaler Avenue. The vehicle, however, continued to follow Shavorea and once again pulled up to Shavorea's driver's side and resumed shooting at her. In response, Shavorea stopped abruptly so that the vehicle would speed by her. After it passed by, the vehicle made a U-turn and continued in Shavorea's direction. Shavorea then drove to a location at Ardery Drive and Baywood Street, parked her vehicle, and began to walk home.

{¶ 11} While walking, Shavorea called 9-1-1 to report the incident. As Shavorea was speaking to the 9-1-1 operator, she noticed that she was walking funny and that her leg was wet. At this point, Shavorea realized that she had been shot in the left leg and needed medical assistance. When Shavorea was found by responding officers, she was taken to Miami Valley Hospital, where she received treatment for a bullet wound in her leg. The bullet remains lodged in Shavorea's leg, as physicians could not remove the bullet without causing greater damage to the leg.

{¶ 12} When law enforcement located Shavorea's vehicle at Ardery Drive and Baywood Street, officers observed four bullet holes on the driver's side of the vehicle. During a search of the vehicle, an evidence technician discovered one fired .380 caliber bullet lying on the driver's seat. Evidence crews additionally discovered two .380 caliber shell casings in the area of the shooting near Siebenthaler and Salem Avenues.

*Crash at Arlene Avenue*

{¶ 13} During the early morning hours of November 26, 2017, Darryl Daniel was sleeping in his residence at 2451 Arlene Avenue in Dayton, Ohio, when he woke up to a loud noise. When Daniel looked around his house, he observed that a two-door, silver

Chevy Monte Carlo had run into his home, completely destroying his garage. Daniel also observed two men crawling out of the vehicle. One man was crawling out of the driver-side window and the other man was crawling out of the passenger-side window. Daniel tackled the man crawling out of the driver-side window and pinned him down until the police arrived. The other man exited the vehicle and mingled into a crowd of people that had gathered outside.

{¶ 14} The man that Daniel had pinned down was identified by police as Davon Williams. Williams was not injured in the accident, but was observed to be intoxicated. At the scene of the crash, officers observed a handgun on the front-passenger floorboard of the Monte Carlo. The handgun was determined to be a .380 caliber Ruger with an empty magazine attached.

{¶ 15} The Monte Carlo was severely damaged in the accident. Because both of the vehicle's doors were pinned shut, "Jaws of Life" equipment and other means had to be used to open the doors to conduct a search of the vehicle. When the vehicle was searched, officers discovered a second empty .380 caliber magazine wedged between the front-passenger seat and the front-passenger door. Two .380 caliber shell casings were also discovered in the rear passenger compartment of the vehicle.

*Break-In at Owens Drive*

{¶ 16} Around 4:30 a.m. on November 26, 2017, Leslie Cox was sleeping in her residence at 4671 Owens Drive in Dayton, Ohio, when she woke up to the sound of glass breaking. When Cox went to her kitchen, she observed that her back kitchen window had been broken and that a black male, who Cox later identified as Drane, had crawled

through the window and into her home.

{¶ 17} Drane told Cox that he was not going to hurt her and that he was running from the police. Drane instructed Cox not to go to her window or door. Drane also told Cox that someone else would be coming into her home. Shortly thereafter, a second black male crawled through Cox's kitchen window. Drane indicated that a third person might be coming too, but a third person never arrived.

{¶ 18} Cox observed that both men were injured and bleeding. Cox specifically recalled that the second man had severe injuries to his face. Drane asked Cox for a nurse, but Cox advised that no nurse was present. Drane then asked for some towels, which Cox provided. Thereafter, Drane had Cox call his mother and the second man's girlfriend in an effort to get them picked up. Cox was eventually able to call her granddaughter, who came over and told the two men to leave. After the men left, Cox and her granddaughter called 9-1-1 to report the incident. Responding officers were dispatched to Cox's residence and Cox told the officers what had happened. Later on, Cox realized that the second man had left his Timberland boot in her bedroom. The boot was then retrieved by a police officer later in the day.

{¶ 19} At approximately 5:00 a.m. that same morning, officers were also dispatched to 623 Shoop Avenue on the report of a male who had been shot in the face. When officers arrived at the scene, a male with severe facial injuries was found sitting in the backseat of a nearby vehicle. The officers observed that the man's facial injuries were consistent with blunt force trauma, not a gunshot wound. The officers also observed that the man was missing a Timberland boot. The man was identified by police as Jermichael Taylor. Detectives later discovered that 623 Shoop Avenue was the

residence of Taylor's mother. An officer took digital photographs of Taylor at the scene and then showed the photographs to Cox, who subsequently identified Taylor as the second man who had entered her residence.

*Forensic Evidence*

{¶ 20} A firearms and ballistics expert from the Miami Valley Regional Crime Lab ("MVRCL") analyzed the Ruger and the two shell casings that were found in the silver Monte Carlo driven by Drane. The expert also analyzed the fired bullet that was found in Shavorea's vehicle and the two shell casings that were found at the scene of the shooting. The expert testified that the bullet found in Shavorea's vehicle and the two shell casings found in the Monte Carlo were all fired from the Ruger. The expert also testified that only one of the two shell casings found at the scene of the shooting was fired from the Ruger.

{¶ 21} A MVRCL DNA expert performed DNA testing on the Ruger by comparing touch DNA found on the Ruger to DNA standards taken from Drane and Taylor. The expert testified that a partial mixed DNA profile was found on the Ruger and that Taylor was excluded as a possible DNA contributor. As to Drane, the expert testified that the test results were inclusive and that Drane could not be included or excluded as a DNA contributor. The expert explained that this meant Drane's DNA may or may not be on the Ruger.

{¶ 22} The same expert also performed DNA testing on blood swabs that were taken from the steering wheel, driver-side airbag, passenger-side airbag, and passenger-side fender of the Monte Carlo. The expert testified that a single source DNA profile was

found on all four samples and that Drane was the DNA contributor.

{¶ 23} DNA testing was also performed on blood swabs taken from a dryer and a bedroom wall in Cox's residence on Owens Drive, and from the Timberland boot found at Cox's residence. The expert testified that a single source DNA profile was found on the sample taken from the dryer, and that Drane was the DNA contributor. The expert also testified that a partial mixed DNA profile was found on the sample taken from the bedroom wall, and that Taylor was the major DNA contributor. Drane, however, was excluded as a contributor from the bedroom wall sample. The expert further testified that multiple blood stains on the Timberland boot were tested and that both Drane and Taylor's DNA were on the boot.

*Map Evidence*

{¶ 24} The State presented Google satellite map images showing the close proximity between the locations of each incident that occurred on the night in question. For example, the image on State's Exhibit 104 showed that Cox's residence on Owens Drive was approximately two blocks from the Arlene Avenue residence where Drane crashed the Monte Carlo. The image on State's Exhibit 97 showed that the area of the shooting incident was a short driving distance away from the Arlene Avenue and Owens Drive residences. Exhibit 97 also showed the location of Club Plush, which Detective Statzer testified was just four to five miles from all the other incidents.

*Verdicts and Sentencing*

{¶ 25} After the State rested its case, Drane moved for a Crim.R. 29 acquittal,

which the trial court denied. The defense then rested its case without calling any witnesses. Following deliberations, the jury found Drane not guilty of robbery, but guilty of the lesser included offense of grand theft of a motor vehicle in violation of R.C. 2913.02(A)(1). The jury also found Drane guilty of burglary, both counts of felonious assault, and both of the three-year firearm specifications attached to the felonious assault counts.

{¶ 26} With regard to the count of having weapons under disability, the parties stipulated that Drane had previously been convicted of a felony offense of violence and a three-year firearm specification in Montgomery C.P. No. 2009-CR-3145. Based on the stipulation and the evidence presented a trial, the trial court found Drane guilty of having weapons under disability and of the three-year and 54-month firearm specifications attached to that offense. The trial court also found Drane guilty of the 54-month firearm specifications that were attached to the two counts of felonious assault.

{¶ 27} At sentencing, the trial court merged the two counts of felonious assault. The State then elected to proceed to sentencing on the count in violation of R.C. 2903.11(A)(1) (serious physical harm). The trial court also merged the three-year and 54-month firearm specifications that were attached to the felonious assault and having weapons under disability offenses. The State thereafter elected to proceed to sentencing on the 54-month firearm specification for both counts.

{¶ 28} After merging the foregoing offenses and specifications, the trial court sentenced Drane to prison for 18 months for grand theft of a motor vehicle, 8 years for felonious assault, 8 years for burglary, 36 months for having weapons under disability, and 54 months for each of the two firearm specifications. The trial court ordered all the

prison terms to be served consecutively, with the 54-month firearm specifications to be served prior to the prison terms for the underlying offenses. Therefore, the trial court sentenced Drane to an aggregate term of 29.5 years in prison.

{¶ 29} Drane now appeals, raising a single assignment of error for review.


**Assignment of Error**

{¶ 30} Under his assignment of error, Drane contends that his convictions for grand theft of a motor vehicle, felonious assault, burglary, having weapons under disability, and the attendant firearm specifications were not supported by sufficient evidence and were against the manifest weight of the evidence. We disagree.

{¶ 31} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "When reviewing a claim as to sufficiency of evidence, the relevant inquiry is whether any rational factfinder viewing the evidence in a light most favorable to the state could have found the essential elements of the crime proven beyond a reasonable doubt." (Citations omitted.) *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997). "The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier-of-fact." (Citations omitted.) *Id.*

{¶ 32} In contrast, "[a] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence

is more believable or persuasive." (Citation omitted.) *Wilson* at ¶ 12. When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence." *State v. Adams*, 2d Dist. Greene Nos. 2013-CA-61, 2013-CA-62, 2014-Ohio-3432, ¶ 24, citing *Wilson* at ¶ 14.

{¶ 33} Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). Therefore, "[t]he credibility of the witnesses and the weight to be given to their testimony are matters for the trier of fac[t] to resolve." *State v. Hammad*, 2d Dist. Montgomery No. 26057, 2014-Ohio-3638, ¶ 13, citing *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). "This court will not substitute its judgment for that of the trier of fac[t] on the issue of witness credibility unless it is patently apparent that the factfinder lost its way." (Citation omitted.) *State v. Bradley*, 2d Dist. Champaign No. 97-CA-03, 1997 WL 691510, *4 (Oct. 24, 1997).

{¶ 34} As previously noted, Drane was convicted of one count of grand theft of a motor vehicle in violation of R.C. 2913.02(A), two counts of felonious assault in violation of R.C. 2903.11(A)(1) and R.C. 2903.11(A)(2), one count of burglary in violation of

2911.12(A)(2), and having weapons under disability in violation of R.C. 2923.13(A)(2). Drane was also convicted of two 54-month firearm specifications. Each of the charges and specifications are addressed separately below.

*Grand Theft of a Motor Vehicle*

{¶ 35} Pursuant to R.C. 2913.02(A)(1), a person commits theft if he or she knowingly obtains or exerts control over property without the consent of the owner with the purpose to deprive the owner of the property. "If the property stolen is a motor vehicle, a violation of this section is grand theft of a motor vehicle, a felony of the fourth degree." R.C. 2913.02(B)(5).

{¶ 36} In challenging the sufficiency of the evidence for grand theft of a motor vehicle, Drane contends that the State did not provide sufficient evidence that he purposely deprived Marquisa Goode of her vehicle without her consent. Although Goode did not testify at trial, the testimony of Dep. Schwieterman established that around 2:00 a.m. on the night in question, Goode called 9-1-1 and reported that her vehicle had been stolen. Dep. Schwieterman testified that Goode made contact with him at Club Plush and told him that three men took her vehicle, one of whom Goode identified as "Davon." Goode also told Dep. Schwieterman that she tried to get the man in the driver's seat out of her vehicle, but that he pushed her to the ground.

{¶ 37} In addition, Davon Williams testified that he, Drane, and Taylor left Club Plush in Goode's vehicle without Goode. Williams also confirmed that Drane was the driver of the vehicle. Drane was further identified as the driver though a photo that Goode provided to Det. Statzer the day after the incident.

{¶ 38} When viewed in a light most favorable to the State, the foregoing testimony sufficiently established that Drane purposely deprived Goode of her vehicle without her consent. Drane's claim to the contrary lacks merit and, based on all the evidence presented at trial, a rational factfinder could have reasonably determined that all essential elements of grand theft of a motor vehicle had been satisfied beyond a reasonable doubt.

{¶ 39} Drane also contends that his conviction for grand theft of a motor vehicle was against the manifest weight of the evidence. Specifically, Drane argues that Goode's comments to Dep. Schwieterman lacked credibility because there was evidence indicating that Goode was intoxicated. Dep. Schwieterman, however, testified that he could not tell if Goode was intoxicated and noted that he did not recall Goode ever mumbling or wobbling when he spoke to her. Regardless, the credibility of the testimony was for the jury to decide and such a determination will not be disturbed on appeal. That said, after weighing all the evidence and reasonable inferences, we do not find that the jury clearly lost its way and created a manifest miscarriage of justice when it found Drane guilty of grand theft of a motor vehicle.

{¶ 40} For the foregoing reasons, Drane's conviction for grand theft of a motor vehicle was supported by sufficient evidence and was not against the manifest weight of the evidence.

*Felonious Assault*

{¶ 41} Pursuant to R.C. 2903.11(A)(1), a person commits felonious assault when he or she knowingly causes serious physical harm to another. R.C. 2903.11(A)(1). Pursuant to R.C. 2903.11(A)(2), a person commits felonious assault when he or she

knowingly causes or attempts to cause physical harm to another by means of a deadly weapon or dangerous ordnance.

{¶ 42} Drane does not dispute that the shooting victim, Shavorea Williams, was the victim of a felonious assault under the foregoing statutes. Drane instead claims that the State did not provide sufficient evidence that he was involved in the shooting incident on which the felonious assault charges were based. In support of this claim, Drane first contends that he was driving a *silver* Monte Carlo on the night in question, and that Shavorea testified that the person who shot at her was riding in a *black* Monte Carlo. Drane also takes issue with the fact that Shavorea testified to seeing only two men in the vehicle when there were actually three men in the vehicle he was driving.

{¶ 43} Despite these discrepancies, the State presented multiple pieces of evidence that linked the silver Monte Carlo, and thus Drane, to the shooting. First, the fired bullet found in Shavorea's vehicle was tested by an expert and it was found to have been fired from the Ruger that the police discovered in the silver Monte Carlo driven by Drane. One of the two shell casings found at the scene of the shooting was also tested and found to have been fired from the same Ruger. This evidence was sufficient to place the silver Monte Carlo at the scene of the shooting on the night in question.

{¶ 44} Moreover, although Shavorea testified that the area of the shooting was "a pretty well-lit area," it would be reasonable to assume that Shavorea got the color of the Monte Carlo wrong due to the stress of the incident and due to her focusing on being shot at. It would also be reasonable to assume that Shavorea only saw two individuals in the vehicle because Williams was passed out in the backseat.

{¶ 45} Drane next contends that he could not have been the shooter because

Shavorea testified to seeing the shooter's hand firing shots out the passenger-side window of the Monte Carlo. Drane claims that since he was the one driving, it could not have been him firing at Shavorea's vehicle. Although the touch DNA testing on the Ruger was inconclusive as to Drane, i.e., Drane's DNA may or may not have been present on the Ruger, the fact remains that Taylor, who was riding in the front-passenger seat, was excluded as a source of DNA on the Ruger. This evidence suggests that it was either Drane or Williams who fired the Ruger. Since Williams testified that he was intoxicated and passed out in the back seat, there was be sufficient evidence for a jury to conclude that Drane was the one who fired the Ruger at Shavorea's vehicle.

{¶ 46} Concerning the hand that Shavorea saw firing shots out the passenger-side window, the State presented circumstantial evidence indicating that there was a second firearm used in the shooting. Specifically, a second empty magazine that did not fit the Ruger was discovered wedged between the front-passenger seat and passenger-side door of the Monte Carlo. Testing also revealed that the second shell casing found at the scene of the shooting was not fired from the Ruger. From this evidence, it would have been reasonable to conclude that a second firearm was used in the shooting. Given the location of the second magazine, it would also have been reasonable to conclude that the second firearm was fired by the front-seat passenger, which would explain the hand that Shavorea saw out the passenger-side window.

{¶ 47} Regardless, even if Drane did not fire any weapon, the State's evidence was sufficient to find him guilty of felonious assault under the theory of complicity. The complicity statute, R.C. 2923.03, provides that: "No person, acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in

committing the offense." R.C. 2923.03(A)(2). " 'To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal.' " *State v. Hancher*, 2d Dist. Montgomery No. 23515, 2010-Ohio-2507, ¶ 50, quoting *State v. Johnson*, 93 Ohio St.3d 240, 245, 754 N.E.2d 796 (2001). "The requisite criminal intent may be inferred from the circumstances of the crime * * * including from ' "presence, companionship and conduct before and after the offense [was] committed." ' " *State v. Koch*, 2d Dist. Montgomery No. 28041, 2019-Ohio-4182, ¶ 43, quoting *State v. Grissom*, 2d Dist. Montgomery No. 25750, 2014-Ohio-857, ¶ 21, quoting *Johnson* at 245. "An aider and abettor is 'punished as if he were a principal offender.' " *Grissom* at ¶ 21, quoting R.C. 2923.03(F).

{¶ 48} In this case, Shavorea's testimony as to how the Monte Carlo sped up beside her when the shots were fired, chased her, and made a U-turn to continue in her direction indicated that Drane aided and abetted the felonious assault by driving in a manner that assisted the shooting. Therefore, when considering all the foregoing evidence in a light most favorable to the State, a reasonable factfinder could have concluded that Drane committed felonious assault in violation of R.C. 2903.11(A)(1) and (A)(2) as either a principle offender or as an aider and abettor. Also, after weighing all the evidence and reasonable inferences, we do not find that the jury clearly lost its way and created a manifest miscarriage of justice in finding Drane guilty of felonious assault.

{¶ 49} For the foregoing reasons Drane's conviction for felonious assault was supported by sufficient evidence and was not against the manifest weight of the evidence.

*Burglary*

{¶ 50} Pursuant to R.C. 2911.12(A)(2), a person commits burglary when he or she uses "force, stealth or deception" to "trespass in an occupied structure * * * that is a permanent or temporary habitation of any person when any person other than an accomplice of the offender is present or likely to be present, with purpose to commit in the habitation any criminal offense."

{¶ 51} In challenging the sufficiency of the evidence for burglary, Drane does not dispute that he used force to trespass into Leslie Cox's residence on Owens Drive. Rather, Drane contends that the State did not provide sufficient evidence that he trespassed in the residence with the purpose to commit a criminal offense. We disagree.

{¶ 52} At trial, the State proceeded on a theory that Drane trespassed in the Owens Drive residence with the purpose to obstruct official business in violation of R.C. 2921.31. A person obstructs official business when, "without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity," the person does "any act that hampers or impedes a public official in the performance of the public official's lawful duties." R.C. 2921.31(A). "[T]his Court has recognized that " ' "[f]leeing from a police officer who is lawfully attempting to detain the suspect * * * is an affirmative act that hinders or impedes the officer in performance of the officer's duties as a public official and is a violation of R.C. 2921.31[.]" ' " *State v. Benton*, 2d Dist. Montgomery No. 27592, 2018-Ohio-2042, ¶ 10, quoting *State v. Branham*, 2d Dist. Montgomery No. 22480, 2008-Ohio-5158, ¶ 10, quoting *State v. Kates*, 169 Ohio App.3d 766, 2006-Ohio-6779, 865

N.E.2d 66, ¶ 24 (10th Dist.).

{¶ 53} Drane first contends that the State's evidence failed to establish that he hampered or impeded a public official because he did not have any contact with the police after he crashed Goode's vehicle and because he was not being chased by the police. We know, however, from Darryl Daniel's testimony that after the crash, Drane and the other occupants fled or, in Williams's case, attempted to flee the scene after crawling through the driver and passenger windows of the vehicle, as both doors were pinned shut. The manner in which Drane escaped the vehicle and fled the scene as opposed to waiting for help supported a finding that he was fleeing from law enforcement. We also note that Dayton Police Officers Terrell Moore and Steven Hargraves testified that, on the night in question, they searched the area for the suspects involved in the accident. Therefore, Drane's claim that he was not being pursued by the police was contrary to the evidence.

{¶ 54} Drane also argues that the only reason he trespassed in the Owens Drive residence was to seek medical aid for his injuries, not to hide from the police. However, Cox specifically testified that after Drane broke into her residence, he told her that he was running from the police. Cox further testified that, although Drane and Taylor were injured and wanted medical attention, they never had her call for a medic, but instead asked her to call Drane's mother and Taylor's girlfriend. Again, had Drane really been seeking medical aid, he could have just waited at the scene of the accident for help.

{¶ 55} Drane alternatively argues that even if his conduct did amount to obstructing official business, he completed that offense after he left the scene of the accident and before trespassing in Cox's residence. However, it is well established that " 'a defendant may form the purpose to commit a criminal offense at any point during the course of the

trespass.' " *State v. Chafin*, 2d Dist. Greene No. 2019-CA-69, 2020-Ohio-3983, ¶ 29, quoting *State v. Fontes*, 87 Ohio St.3d 527, 721 N.E.2d 1037 (2000). *See also State v. Cook*, 2d Dist. Montgomery No. 26809, 2016-Ohio-4574, ¶ 7. Therefore, Drane could have formed the intent to obstruct official business before, during, or after breaking into Cox's residence.

{¶ 56} When the aforementioned evidence is viewed in a light most favorable to the State, a reasonable factfinder could have concluded that Drane trespassed by force into Cox's residence with the purpose to obstruct official business in violation of R.C. 2921.31. Therefore, we find that the State established all essential elements of burglary at trial. Furthermore, after weighing all the evidence and reasonable inferences, we do not find that the jury clearly lost its way and created a manifest miscarriage of justice when it found Drane guilty of burglary.

{¶ 57} For the foregoing reasons, Drane's conviction for burglary was supported by sufficient evidence and was not against the manifest weight of the evidence.

*Having Weapons Under Disability*

{¶ 58} Pursuant to R.C. 2923.13(A)(2): "[N]o person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if * * * [t]he person is under indictment for or has been convicted of any felony offense of violence or has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense of violence."

{¶ 59} Prior to trial, the parties stipulated that Drane had a prior conviction for a felony offense of violence and was therefore under a weapons disability at the time of the

charged offenses. Drane, however, contends that that the State did not provide sufficient evidence that he knowingly acquired, had, carried, or used a firearm on the night in question. We disagree.

{¶ 60} In discussing Drane's conviction for felonious assault, we have already determined that there was sufficient evidence to find that Drane had fired the Ruger found in the Monte Carlo. We have also determined that even if Drane had not fired the Ruger, or any firearm for that matter, there was also sufficient evidence to find that Drane aided and abetted the principle offender of the felonious assault by driving the Monte Carlo in a manner that facilitated the shooting of Shavorea Williams. *See State v. Adams*, 8th Dist. Cuyahoga No. 93513, 2010-Ohio-4478, ¶ 17-21 (an accomplice can be convicted of having weapons under disability without holding the firearm if that accomplice aided and abetted the person who actually processed and brandished the firearm); *Dalmida v. Turner*, 6th Cir. No. 19-3627, 2020 WL 7873080, *5 (July 22, 2020) ("Ohio law allows an accomplice to be convicted of having weapons under disability if he aids and abets the person who actually used the firearm."). Furthermore, based on the evidence presented at trial, we cannot say that the trial court lost its way and created a manifest miscarriage of justice when it found Drane guilty of having weapons under disability.

{¶ 61} For the foregoing reasons Drane's conviction for having weapons under disability was supported by sufficient evidence and was not against the manifest weight of the evidence.

*Firearm Specifications*

{¶ 62} Drane was convicted of two 54-month firearm specifications under R.C.

2941.145(D). Pursuant to R.C. 2941.145(D), a mandatory 54-month prison term for a firearm specification is permitted where "the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed a firearm, or used the firearm to facilitate the offense and that the offender previously has been convicted of or pleaded guilty to a firearm specification of the type described in section 2941.141, 2941.144, 2941.145, 2941.146, or 2941.1412 of the Revised Code."

{¶ 63} Here the parties stipulated that Drane had been previously convicted of a three-year firearm specification. And again, we have already determined that there was sufficient evidence to establish that Drane fired the Ruger found in the Monte Carlo while committing the offenses in question or, at the very least, that he aided and abetted the shooting. " 'It is well settled that an unarmed accomplice can be convicted of an underlying felony, together with a firearm specification, based on an aider and abettor status.' " *State v. Dixon*, 2d Dist. Montgomery No. 28797, 2021-Ohio-225, ¶ 10, quoting *State v. Porch*, 8th Dist. Cuyahoga No. 65348, 1994 WL 173509, *4 (May 5, 1994), citing *State v. Chapman*, 21 Ohio St.3d 41, 487 N.E.2d 566 (1986). Therefore, Drane's conviction for the two 54-month firearm specifications was supported by sufficient evidence and was not against the manifest weight of the evidence.

{¶ 64} Because Drane's convicted offenses and specifications were all supported by sufficient evidence and were not against the manifest weight of the evidence, his sole assignment of error is overruled.

**Conclusion**

{¶ 65} Having overruled Drane's assignment of error, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and EPLEY, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Lisa M. Light
Bradley S. Baldwin
Hon. Steven K. Dankof